# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF GEORGIA
# ALBANY DIVISION

| | |
|---|---|
| JUSTIN L. POWELL, individually and on behalf of all others similarly situated, | CIVIL ACTION FILE NO. _____ |
| Plaintiff, | **Complaint – Class Action** |
| v. | JURY TRIAL DEMANDED |
| KONINKLIJKE PHILIPS N.V., PHILIPS NORTH AMERICA LLC, and PHILIPS RS NORTH AMERICA LLC, | |
| Defendants. | |

## CLASS ACTION COMPLAINT

Plaintiff JUSTIN L. POWELL ("Plaintiff"), brings this Class Action Complaint against Defendants Koninklijke Philips N.V., Philips North America LLC, and Philips RS North America LLC (collectively "Defendants" or "Philips"), on behalf of himself and all others similarly situated, and alleges as follows based on personal knowledge, the investigation of counsel, and information and belief:

## INTRODUCTION

1.

Plaintiff brings this action on behalf of themselves and proposed classes

of purchasers of Continuous Positive Airway Pressure ("CPAP") devices, BiLevel Positive Airway Pressure ("BiPAP") devices, and mechanical ventilators manufactured by Philips (collectively referred to as the "Subject Devices"), which contain polyester-based polyurethane sound abatement foam ("PE-PUR Foam") and are subject to a June 14, 2021 recall by Philips because of health risks relating to the degradation and off-gassing of chemicals from the PE-PUR Foam. Plaintiff's claims concern the breaches of warranties, unlawful, deceptive, and misleading practices, and fraudulent and negligent representations, omissions, and concealment by Philips in connection with the manufacturing, marketing, and sales of the Subject Devices.

2.

CPAP and BiPAP devices are typically used by those who have been diagnosed with sleep apnea, a serious health condition which causes interruptions or pauses in a person's breathing while sleeping. These devices send oxygen into the user's nose and mouth as he or she sleeps, which keeps airways open and facilitates normal breathing. For those who use a CPAP and BiPAP device, they are essential to health. Discontinuance of use for any period of time can result in serious bodily injuries and death. Ventilators typically treat respiratory failure.

3.

Philips is one of the companies that manufactures and sells CPAP and BiPAP devices. Philips designed, marketed, and sold millions of CPAP and BiPAP devices containing the PE-PUR Foam. The CPAP and BiPAP devices subject to Philips's recall include the following models:

**Continuous Ventilator, Non-life Supporting**



DreamStation
ASV



DreamStation
ST, AVAPS



SystemOne
ASV4



C Series
ASV, S/T, AVAPS



OmniLab Advanced
Plus
In-Lab Titration Device

## CPAP and BiLevel PAP Devices
All Affected Devices Manufactured Before 26 April 2021, All Device Serial Numbers

**Continuous Ventilator, Minimum Ventilatory Support, Facility Use**



E30
(Emergency Use
Authorization)

**Non-continuous Ventilator**



SystemOne
(Q series)



DreamStation
CPAP, Auto CPAP, BiPAP



DreamStation GO
CPAP, APAP



Dorma 400, 500
CPAP



REMStar SE Auto
CPAP

4.

    Philips also sold mechanical ventilators containing the PE-PUR Foam. The mechanical ventilators that are subject to Philips's recall include the following models:

## Mechanical Ventilators
All Affected Devices Manufactured Before 26 April 2021, All Device Serial Numbers

**Continuous Ventilator**



Trilogy 100
Ventilator



Trilogy 200
Ventilator



Garbin Plus, Aeris,
LifeVent
Ventilator

**Continuous Ventilator, Minimum Ventilatory Support, Facility Use**



A-Series BiPAP Hybrid
A30
(not marketed in US)



A-Series BiPAP V30
Auto
Ventilator

**Continuous Ventilator, Non-life Supporting**



A-Series BiPAP A40
(not marketed in US)



A-Series BiPAP A30
(not marketed in US)

https://www.usa.philips.com/healthcare/e/sleep/communications/srcupdate#section_2 ("What devices are affected by the recall notification / field safety notice?")[1]

5.

On June 14, 2021, Philips recalled all of the devices shown above due to two issues in the PE-PUR Foam in such devices that presented health risks to users. First, Philips explained that the PE-PUR Foam may degrade upon use

---

[1] According to Philips's recall notice, the A-Series BiPAP Hybrid A30, A-Series BiPAP A40, and A-Series BiPAP A30 continuous ventilators are not marketed in the United States, and thus would not be within the proposed classes.

of the devices. When the PE-PUR Foam degrades, particles "may enter the device's air pathway and be ingested or inhaled by the user."[2] Second, the PE-PUR Foam "may off-gas certain chemicals."[3] According to Philips, the risks from PE-PUR Foam degradation include "irritation (skin, eye, respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (e.g., kidneys or liver) and toxic carcinogenic affects."[4] The risks from chemical exposure due to off-gassing include "headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects."[5] Philips acknowledged that "these issues can result in serious injury which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment." Philips's use of toxic PE-PUR Foam that presents the serious and unreasonable health risks described above and in Philips's June 14, 2021 recall notice is hereinafter generally referred to as the "Defect."

6.

In the June 14, 2021 recall, Philips directed users of the recalled CPAP

---

[2] https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-letter-2021-05-a-2021-06-a.pdf

[3] *Id.*

[4] *Id.*

[5] *Id.*

and BiPAP devices to "discontinue use of your device."[6]

7.

Upon information and belief, Philips has known about serious and unreasonable safety hazards for years before the recall. Philips acknowledges that it has received several complaints from users of the Subject Devices concerning the presence of black particles within the airpath circuit of the devices. Philips also received reports of illness from users including headaches, upper airway irritation, cough, chest pressure, and sinus infections. Yet, it was not until April 2021 that Philips warned users and the public about the serious and unreasonable safety hazards. Then, on June 14, 2021, Philips provided further guidance, issuing a recall and for the first time directing users to cease using the Subject Devices.

8.

Philips is aware that the Subject Devices are needed for health and well-being and that CPAP and BiPAP devices are daily treatment for sleep apnea. Yet, in announcing the recall and instructing users of the Subject Devices to cease use, Philips provided no alternative option and announced no definite plan or timetable for replacing or repairing the Subject Devices.

---

[6] *Id.* at 4.

9.

Philips suggested that users "work with your physician or Durable Medical Equipment (DME) provider to determine the most appropriate options for continued treatment,"[7] essentially saying to Plaintiff and the Class Members - "best of luck, you're on your own."

10.

Philips's recall left the users of its Subject Devices with no choice but either purchase or rent a replacement (if one could be located), stop using a CPAP or BiPAP device (neglect their treatment regimen), or continue to use the unsafe recalled machine (neglect Philips's recall instructions). None of these are good, satisfactory, or reasonable options for Plaintiff and the Class Members. To make matters worse, for those with the means to go out and find and buy a non-recalled replacement, Philips's recall has caused a supply shortage for competitor and non-recalled devices. So, even for those who can afford a replacement, most have been unable to find one.

11.

Based on Philips's wanton disregard for the health and safety of its customers – as shown by its willingness to manufacture, market, and sell a

---

[7] *Id.*

defective and unsafe product to customers in a deceptive, fraudulent and misleading manner – and Philips's refusal to provide an appropriate repair, replacement, or refund to such customers, Plaintiff brings this Class Action Complaint to represent a class of similarly situated persons defined below, who like Plaintiff, purchased the Subject Devices, and to obtain all relief from the harm suffered by Plaintiff and the Class Members as appropriate under the applicable law.

## PARTIES

12.

Plaintiff Justin L. Powell resides in Leesburg, Georgia and is 38 years old. Plaintiff Powell has been diagnosed with obstructive sleep apnea. He purchased a Philips DreamStation device in April 2020. Plaintiff Powell's device is one of the now-recalled devices. He would not have purchased his Philips DreamStation if he had known it was defective, that its use presented a serious and unreasonable risk to his health and safety, and that Philips was going to direct him to discontinue use without offering a prompt repair, replacement, or refund. Daily use of his device is important to Plaintiff Powell's health and wellness. Plaintiff Powell demands a refund or a cost-free replacement with a non-defective device, ongoing medical monitoring, and all

other appropriate damages and relief for all the harm he has suffered as a result of his defective Philips DreamStation.

13.

Defendant Koninklijke Philips N.V. ("Royal Philips") is a Dutch multinational corporation with its principal place of business in Amsterdam, Netherlands. Royal Philips is the parent company of Philips North America LLC and Philips RS North America LLC. Upon information and belief, Royal Philips holds directly or indirectly 100% of both Philips North America LLC and Philips RS North America LLC, and Royal Philips controls Philips North America LLC and Philips RS North America LLC in the manufacturing, selling, distributing, and supplying of the Subject Devices.

14.

Defendant Philips North America LLC is a Delaware company authorized to do business in Georgia and with its principal place of business in Cambridge, Massachusetts.

15.

Defendant Philips RS North America LLC is a Delaware company authorized to do business in Georgia with its principal place of business in Pittsburgh, Pennsylvania. Philips RS North America LLC formerly operated

under the business name Respironics, Inc. ("Respironics"). Royal Philips acquired Respironics in 2008.

16.

"Philips" or "Defendants" refers to each Defendant individually and collectively.

## JURISDICTION AND VENUE

17.

Subject matter jurisdiction is proper in this Court under 28 U.S.C. § 1332(d)(2). The aggregate amount in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and Plaintiff and most of the members of the proposed Classes are citizens of states different from Defendants. No Defendant is a citizen of the state in which the action has been filed. The proposed Classes consist of well over 100 members.

18.

Personal jurisdiction is proper in this Court as Defendants serve a market for the Subject Devices in Georgia (including this District), Plaintiff purchased his recalled devices in Georgia (within this District), and Plaintiff's losses at issue occurred in Georgia (within this District). Further, Defendants conduct business in Georgia, have sufficient minimum contacts in Georgia, and purposefully and intentionally avail themselves of the markets within Georgia

through the promotion, sale, marketing, and distributions of its products including the Subject Devices. The unlawful acts of Defendants that are the subject matter of this case have been directed at, targeted, and have had the effect of causing injury to persons residing in Georgia and in this District, as well as throughout the United States.

19.

Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendants transact business in this District and a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### Sleep Apnea and the Use of CPAP Devices, BiPAP Devices, and Mechanical Ventilators

20.

Sleep apnea is a common sleep disorder afflicting millions of Americans. Sleep apnea is a condition that results in a person's breathing being repeatedly interrupted or paused during sleep. This often occurs because the throat or airways briefly relax and collapse or something temporarily blocks them. These temporary breathing lapses cause lower-quality sleep and affect the body's supply of oxygen, leading to potentially serious health consequences. Serious

cases can lead to hypertension, heart attack, Type 2 diabetes, metabolic syndromes, liver problems, and stroke, among other medical ailments.

21.

CPAP therapy is a common nonsurgical treatment for sleep apnea. In CPAP therapy, a CPAP device's compressor generates a continuous stream of pressurized air that travels through an air filter into a flexible tube. The tube delivers purified air to the user through a mask over the nose or mouth, providing continuous air pressure to a person's throat, pushing against any blockages and opening airways so the lungs receive plenty of oxygen. With this flow of oxygen, the airway does not collapse during inhalation, breathing does not pause, and the CPAP user does not repeatedly wake up to resume breathing. CPAP therapy treats sleep apnea by assisting breathing in this manner.

22.

BiPAP therapy is another nonsurgical treatment for sleep apnea and an alternative to CPAP therapy. BiPAP therapy is similar to CPAP therapy in many ways, as it also uses a mask over the nose or mouth to maintain positive air pressure in a user's airway. The main difference between BiPAP and CPAP therapy is that instead of delivering a continuous level of air pressure like a

CPAP device, a BiPAP device delivers two different levels of air pressure – a higher level on inspiration and a lower level on exhalation.

23.

CPAP and BiPAP devices are used daily because a discontinuance of use by someone who suffers from sleep apnea will result in interruptions and pauses in breathing during sleep and the resulting symptoms that have a serious and deleterious impact on health.

24.

Respiratory failure is a serious condition occurring when the lungs cannot get enough oxygen into the blood. A common symptom is shortness of breath and difficulty breathing. Many underlying conditions can cause respiratory failure and acute respiratory failure is often caused by disease or injury that affects a person's breathing.

25.

Mechanical ventilators are often used to treat respiratory failure by helping people breathe. A mechanical ventilator pushes airflow into a person's lungs to help them breathe. Mechanical ventilators can be invasive using a tube inserted into the airway, often in an intensive care unit of a hospital or long-term institution. Mechanical ventilators can also be non-invasive, used at home by people with respiratory difficulties.

***Philips Recalled the Subject Devices Due to Serious Health and Safety Hazards***

26.

Philips developed, manufactured, and sold the Subject Devices under the "Sleep & Respiratory Care" segment of its business operations.

27.

Among the Philips CPAP and BiPAP devices is its "Dream Family" line which includes the original DreamStation launched in October 2015. Philips's DreamStation products are among the best-selling sleep apnea CPAP and BiPAP devices on the market.

28.

Philips advertises itself as a "global leader in the Sleep and Respiratory markets."   https://www.philips.ca/healthcare/solutions/sleep-and-respiratory-care.

29.

Philips promises prospective users that they will "breathe easier, sleep more naturally." https://www.usa.philips.com/healthcare/e/respironics#_united_states.

30.

Philips further promises prospective users that "[o]ur sleep therapy

systems are designed with the needs of care practitioners and patients in mind." https://www.usa.philips.com/ healthcare/solutions/sleep/sleep-therapy.

31.

Philips further promises that "[o]ur sleep therapy systems reflect our commitment to providing exceptional therapy, enhanced patient comfort, and essential compliance tools so important in today's challenging environment." https://www.usa.philips.com/c-e/smartsleep/science-of-smartsleep.html.

32.

Philips boasts that it "has the most prescribed PAP systems by U.S. sleep physicians."     https://www.usa.philips.com/healthcare/solutions/sleep/sleep-therapy.

33.

The Subject Devices can cost several hundreds, even thousands, of dollars per device. Philips has sold millions of them in the United States.

34.

The Subject Devices contain PE-PUR Foam used to reduce the sound of the operation of the device. Air passes through the PE-PUR Foam before it is pumped into the patient's airway and some of the sound generated by the device is absorbed by the PE-PUR Foam.

-16-

35.

On April 26, 2021, as part of its Q1 2021 Quarterly Report, Philips disclosed for the first time, under a section entitled "Regulatory Update," that user reports had led to a discovery that the PE-PUR Foam posed significant health risks to users. The "Regulatory Update" section read in its entirety:

> Philips has determined from user reports and testing that there are possible risks to users related to the sound abatement foam used in certain of Philips' sleep and respiratory care devices currently in use. The risks include that the foam may degrade under certain circumstances, influenced by factors including use of unapproved cleaning methods, such as ozone*), and certain environmental conditions involving high humidity and temperature. The majority of the affected devices are in the first-generation DreamStation product family. Philips' recently launched next-generation CPAP platform, DreamStation 2, is not affected. Philips is in the process of engaging with the relevant regulatory agencies regarding this matter and initiating appropriate actions to mitigate these possible risks. Given the estimated scope of the intended precautionary actions on the installed base, Philips has taken a provision of EUR 250 million.[8]

36.

Seven weeks later, on June 14, 2021, "as a result of extensive ongoing analysis," Philips announced a recall of the products using PE-PUR Foam, which are the numerous models of CPAP and BiPAP devices and the

---

[8] First Quarter Results, Philips (Apr. 26, 2021), https://www.results.philips.com/ publications/q121/downloads/pdf/en/philips-first-quarter-results-2021-report.pdf

mechanical ventilators shown above (the "Subject Devices"). In the U.S. recall

notification, Philips proclaimed as follows:

> Philips Respironics is voluntarily recalling the below devices due to two (2) issues related to the polyester-based polyurethane (PE-PUR) sound abatement foam used in Philips Continuous and Non-Continuous Ventilators: 1) PE-PUR foam may degrade into particles which may enter the device's air pathway and be ingested or inhaled by the user, and 2) the PE-PUR foam may off-gas certain chemicals. The foam degradation may be exacerbated by use of unapproved cleaning methods, such as ozone (see FDA safety communication on use of Ozone cleaners), and off-gassing may occur during operation.

> These issues can result in serious injury which can be life-threatening, cause permanent impairment, and/or require medical intervention to preclude permanent impairment. To date, Philips Respironics has received several complaints regarding the presence of black debris/particles within the airpath circuit (extending from the device outlet, humidifier, tubing, and masks). Philips also has received reports of headache, upper airway irritation, cough, chest pressure and sinus infection. The potential risks of particulate exposure include: irritation (skin, eye, and respiratory tract), inflammatory response, headache, asthma, adverse effects to other organs (e.g. kidneys and liver) and toxic carcinogenic affects. The potential risks of chemical exposure due to off-gassing include: headache/dizziness, irritation (eyes, nose, respiratory tract, skin), hypersensitivity, nausea/vomiting, toxic and carcinogenic effects. There have been no reports of death as a result of these issues.[9]

---

[9] https://www.fda.gov/safety/recalls-market-withdrawals-safety-alerts/philips-issues-recall-notification-mitigate-potential-health-risks-related-sound-abatement-foam3A%20June%2030%2C%202021,due%20to%20potential%20health%20risks

37.

In announcing the recall, Philips stated that "[t]o date, [it] has produced millions of Bi-Level PAP, CPAP and mechanical ventilator devices using the PE-PUR sound abatement foam."[10] As one of the largest makers of sleep apnea devices and ventilators, Philips Chief Executive Officer Frans van Houten reported that between 3 and 4 million devices were subject to the recall.[11]

38.

Philips identified the following CPAP and BiPAP devices as subject to the recall:

| All Devices manufactured before 26 April 2021, All serial numbers | |
|---|---|
| Continuous Ventilator, Minimum Ventilatory Support, Facility Use | E30 (Emergency Use Authorization) |
| Continuous Ventilator, Non-life Supporting | DreamStation ASV |
| | DreamStation ST, AVAPS |
| | SystemOne ASV4 |
| | C-Series ASV |
| | C-Series S/T and AVAPS |
| | OmniLab Advanced+ |
| Noncontinuous Ventilator | SystemOne (Q-Series) |
| | DreamStation |
| | DreamStation Go |
| | Dorma 400 |
| | Dorma 500 |
| | REMstar SE Auto |

---

[10] https://www.usa.philips.com/a-w/about/news/archive/standard/news/press/2021/ 20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html

[11] Philips recalls ventilators, sleep apnea machines due to health risks, NBC News, https://www.nbcnews.com/business/consumer/philips-recalls-ventilators-sleep-apnea-machines-due-health-risks-n1270725

39.

Philips identified the following mechanical ventilators as subject to the recall:

| All Devices manufactured before 26 April 2021, All serial numbers | |
|---|---|
| Continuous Ventilator | Trilogy 100 |
| | Trilogy 200 |
| | Garbin Plus, Aeris, LifeVent |
| Continuous Ventilator, Minimum Ventilatory Support, Facility Use | A-Series BiPAP Hybrid A30 (not marketed in US) |
| | A-Series BiPAP V30 Auto |
| Continuous Ventilator, Non-life Supporting | A-Series BiPAP A40 |
| | A-Series BiPAP A30 |

40.

Philips provided the following guidance to users, including directing all users of recalled CPAP and BiPAP devices to immediately cease use:

**Recall notification\* advise [sic] for patients and customers**

*Based on the latest analysis of potential health risks and out of an abundance of caution, the recall notification advises patients and customers to take the following actions:*

- ***For patients using affected BiLevel PAP and CPAP devices***: Discontinue use of your device and work with your physician or Durable Medical Equipment (DME) provider to determine the most appropriate options for continued treatment. To continue use of your device due to lack of alternatives, consult with your physician to determine if the benefit of continuing therapy with your device outweighs the risks identified in the recall notification.\*

- ***For patients using affected life-sustaining mechanical ventilator devices***: Do not stop or alter your prescribed therapy until you have talked to your physician. Philips

recognizes that alternate ventilator options for therapy may not exist or may be severely limited for patients who require a ventilator for life-sustaining therapy, or in cases where therapy disruption is unacceptable. In these situations, and at the discretion of the treating clinical team, the benefit of continued usage of these ventilator devices may outweigh the risks identified in the recall notification.

**Possible health risks**

The company continues to monitor reports of potential safety issues as required by medical device regulations and laws in the markets in which it operates. To date, there have been no reports of death as a result of these issues. Philips has received reports of possible patient impact due to foam degradation. The potential risks of particulate exposure include headache, irritation, inflammation, respiratory issues, and possible toxic and carcinogenic effects. The potential risks of chemical exposure due to off-gassing include headache, irritation, hypersensitivity, nausea/vomiting, and possible toxic and carcinogenic effects. Philips has received no reports regarding patient impact related to chemical emissions.[12]

41.

Along with the recall notification, on June 14, 2021, Philips issued "Clinical information for physicians," which explained that degradation and off-gassing from the PE-PUR Foam "may lead to patient harm and impact clinical care."[13]

---

[12] https://www.usa.philips.com/a-w/about/news/archive/standard/news/press/2021/ 20210614-philips-issues-recall-notification-to-mitigate-potential-health-risks-related-to-the-sound-abatement-foam-component-in-certain-sleep-and-respiratory-care-devices.html

[13] https://www.philips.com/c-dam/b2bhc/master/landing-pages/src/update/documents/philips-recall-clinical-information-for-physicians-and-providers.pdf

42.

With respect to the potential for the PE-PUR Foam degrading into particles and then entering the device's air pathway and being ingested or inhaled by the user, Philips explained that "[t]he absence of visible particles does not mean that foam breakdown has not already begun. Lab analysis of the degraded foam reveals the presence of potentially harmful chemicals including . . . Toluene Diamine, Toluene Diisocyanate, and Diethylene glycol."[14] These chemicals are highly toxic and should not be ingested or inhaled.

43.

With respect to the potential for the PE-PUR Foam off-gassing certain chemicals, Philips explained that "[l]ab testing performed for and by Philips has also identified the presence of [Volatile Organic Compounds (VOCs)] which may be emitted from the sound abatement foam component of affected device(s). VOCs are emitted as gases from the foam included in the CPAP, BiLevel PAP and MV devices and may have short- and long-term adverse health effects. Standard testing identified two compounds of concern (COC) may be emitted from the foam that are outside of safety thresholds. The

---

[14] *Id.*

compounds identified are the following: Dimethyl Diazine and Phenol, 2,6-bis (1,1-dimethylethyl)-4-(1-methylproply)-."[15]

44.

Upon information and belief, Philips knew about serious and unreasonable safety hazards long before the April 26, 2021 "Regulatory Update" and the June 14, 2021 recall. Since introducing the Subject Devices, Philips has received several complaints from users of the Subject Devices concerning the presence of black particles within the airpath circuit of the devices. Philips also received reports of illness from users.

45.

At no time prior to the April 26, 2021 Regulatory Update did Philips disclose to purchasers and users of the Subject Devices that the PE-PUR Foam used in the Subject Devices may degrade or off-gas upon use or disclose any of the potential health risks associated with such occurrence.

46.

Philips has not disclosed when it first received complaints or reports of black particles or learned of the potential for the PE-PUR Foam to degrade or off-gas.

---

[15] *Id.*

47.

For some period of time prior to ceasing manufacture and sale of the Subject Devices, Philips was aware of the issues concerning the PE-PUR Foam, yet continued to market and sell the Subject Devices.

### *Despite the Health Risks Rendering the Subject Devices Unsafe, Philips Has Not Replaced Them or Offered Any Meaningful Solution to  and the Putative Class Who Require Daily Use*

48.

Because of the serious health risks associated with the use of the Subject Devices, they have been rendered unsafe for use. Philips has directed users of the recalled CPAP and BiPAP devices to discontinue use and has made clear that continued use of the recalled mechanical ventilators presents serious and unreasonable health risks from the PE-PUR Foam.

49.

Philips is aware that the Subject Devices are needed for health and well-being and that CPAP and BiPAP devices are daily treatment for sleep apnea. Yet, in announcing the recall and instructing users of the Subject Devices to cease use, Philips provided no alternative option and announced no definite plan or timetable for replacing or repairing the Subject Devices.

50.

Philips has not offered a replacement for the Subject Devices and it is

believed that it may take many months or more for Philips to provide replacement foam.

51.

Philips has left the users of its Subject Devices with no choice but either purchase or rent a replacement (if one could be located), stop using a CPAP or BiPAP device (neglect their treatment regimen), or continue to use the unsafe recalled machine (neglect Philips's recall instructions). None of these are good, satisfactory, or reasonable options for Plaintiff and the Class Members. To make matters worse, for those with the means to buy a non-recalled replacement, the massive recall has resulted in a supply shortage and most people have been unable to find one.

52.

Through the recall and associated public statements, Philips has admitted that the Subject Devices are defective and unsafe. The Subject Devices have no value and/or have a far lesser value than what was paid and the Subject Devices would not have been purchased if Plaintiff and the Class Members were informed of the Defect at the time of sale.

53.

Plaintiff and the Class Members have suffered substantial loss, harm, and damages resulting from their purchase and use of the Subject Devices.

-25-

## CLASS ACTION ALLEGATIONS

### 54.

Plaintiff brings this action as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), 23(b)(3), and/or 23(c)(4).

### 55.

Plaintiff seeks class certification on behalf of a class defined as follows (the "Class"):

> **Nationwide Class:** All persons in the United States who purchased or leased one of the Subject Devices for personal or household use.

### 56.

Plaintiff seeks class certification on behalf of a subclass defined as follows (the "Georgia Subclass"):

> **Georgia Subclass:** All persons in the Georgia who purchased or leased one of the Subject Devices for personal or household use.

### 57.

The Nationwide Class and the Georgia Subclass are collectively referred to as the "Class." Excluded from the Class are Defendants, their affiliates, employees, officers and directors, and the Judge assigned to this case.

### 58.

Plaintiff reserves the right to modify, change, or expand the Class

definitions based on discovery of new information and to the extent necessary to ensure manageability.

59.

*a.*      *Numerosity*: The members of the Class are so numerous that joinder of individual members is impracticable. While the exact number of members of the Class is not known at this time, such information is in the possession of Defendants and is readily ascertainable from Defendants' records. Based on information and belief including acknowledgements by Philips and reporting on the recall, the proposed Nationwide Class contains several million individuals and the proposed Georgia Subclass contains over one-hundred thousand members. The Class is therefore sufficiently numerous to make joinder impracticable and impossible.[16]

*b.*      *Existence and Predominance of Common Questions of Fact and Law*: Common questions of law and fact exist as to all members of the Class. These questions predominate over any questions affecting only individual Class Members. These common legal and factual questions include, but are not limited to:

i.      Whether the Subject Devices are defective and unsafe for

---

[16] As explained in Paragraph 17, the jurisdiction amount for this action is easily met. There are millions of Subject Devices and each of them cost from several hundred to several thousand dollars.

use;

ii.  Whether Philips knew or should have known that its Subject Devices contained the Defect, were unsafe for human use, and posed unreasonable safety hazards from the degradation of the PE-PUR Foam; and if so, when Philips discovered this;

iii.  Whether Philips knowingly failed to disclose the existence and cause of the Defect in the Subject Devices;

iv.  Whether the Defect would be important and material to a reasonable person, because, among other things, it poses an unreasonable safety hazard;

v.  Whether the Defect is latent or hidden, such that Plaintiff and the Class Members could not reasonably discover it;

vi.  Whether Philips misrepresented the Subject Devices as safe;

vii.  Whether Philips's conduct, as alleged in this Complaint, was likely to mislead a reasonable consumer;

viii.  Whether Philips's statements, concealments, and omissions regarding the Subject Devices were material to a reasonable consumer;

ix.  Whether the Subject Devices have retained any value or suffered a dimunition of value as a result of the Defect and the recall;

x.  Whether the Subject Devices were unfit for the ordinary purposes for which they were used;

xi.  Whether Philips's conduct constitutes a breach of express warranty;

xii.    Whether Philips's conduct constitutes a breach of implied warranty;

xiii.   Whether Philips's practices constitute unfair and deceptive acts or practices under the Georgia Uniform Deceptive Trade Practices Act;

xiv.    Whether Philips was unjustly enriched by the sale of the Subject Devices;

xv.     Whether Plaintiff and the Class Members are entitled to damages on the counts where damages are an available remedy;

xvi.    Whether Plaintiff and the Class Members are entitled to restitution, equitable relief, and/or injunctive relief;

xvii.   The appropriate measurement of restitution and/or measure of damages to Plaintiff and the Class Members; and

xviii.  Whether Defendants' conduct tolls any or all appliable limitations periods;

*c.*    ***Typicality:*** Plaintiff's claims are typical of the claims of the other members of the proposed Class and Georgia Subclass. Plaintiff and members of the Nationwide Class and Georgia Subclass suffered injuries as a result of Defendants' wrongful conduct that is uniform across the Nationwide Class and Georgia Subclass.

*d.*    ***Adequacy:*** Plaintiff's interests are aligned with the Nationwide Class and Georgia Subclass that they seek to represent. Plaintiff has and will

continue to fairly and adequately represent and protect the interests of the members of the Nationwide Class and Georgia Subclass. Plaintiff has retained competent counsel highly experienced in complex litigation and class actions is an adequate representative of the Nationwide Class and Georgia Subclass because his interests do not conflict with the interests of the Nationwide Class and Georgia Subclass that he seeks to represent; Plaintiff has retained counsel competent and highly experiences in complex class action litigation, and he intends to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and his counsel.

      **e.**    ***Superiority, Predominance, and Manageability:*** A class action is superior to other available means for the fair and efficient adjudication of this controversy and the claims of Plaintiff and the Class Members and the questions of law and fact common to all class members predominate over questions affecting any individual class members. The injury suffered by each Class Member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation required by Philips's conduct. It would be impracticable, and in fact virtually impossible, for all Class Members to individually and effectively redress the wrongs done to them. Prosecution of separate actions would also impose heavy

burdens upon the Courts and Philips. Individualized litigation also presents a potential for inconsistent or contradictory judgments. Individualized litigation also increases the delay and expense to all parties and to the court system. By contrast, class treatment presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense, and will promote uniform decision-making.

*f.*    ***Ascertainability:*** The Class Members are ascertainable because they are defined by the objective criteria of having purchased a Subject Device, and they will be readily ascertained through Philips's records.

60.

As the rights of each member of the Class were violated in a similar manner based upon Philips's uniform actions, final relief, including equitable relief, with respect to the Class as a whole is appropriate.

## TOLLING OF STATUTES OF LIMITATIONS

61.

***Fraudulent Concealment Tolling***: Any applicable statutes of limitations have been tolled by Philips's knowing and active concealment, omissions, and misleading actions, as alleged in this Complaint. Plaintiff and

the Class Members were kept ignorant of critical information required for the prosecution of their claims, without any fault or lack of diligence on their part. Philips actively concealed from Plaintiff and the member of the Class, and their physicians, the true risks associated with the Subject Devices.

62.

***Discovery Tolling***: Philips knowingly, affirmatively, and actively concealed the true character, quality, and nature of its CPAP and BiPAP Machines. Plaintiff and the Class Members reasonably relied upon Philips's knowing, affirmative, and active concealment. As a result of Philips's actions, Plaintiff and the Class Members could not reasonably have discovered, through reasonable diligence, the true nature of the Philips's unlawful conduct and the defective and unsafe condition of the Subject Devices. Based on the foregoing, Philips is estopped from relying on any statutes of limitations as a defense in this action.

## CAUSES OF ACTION

## COUNT I

## BREACH OF EXPRESS WARRANTY
**(on behalf of the Nationwide Class or, Alternatively, on Behalf of the Georgia Subclass)**

63.

Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

64.

Philips, through Respironics, Inc. n/k/a Defendant Philips RS North America LLC, provided an express warranty to Plaintiff.

65.

Philips, through Respironics, Inc. n/k/a Philips RS North America LLC, expressly warranted that the Subject Devices "shall be free from defects of workmanship and materials and will perform accordance with the product specifications for a period of two (2) years to the dealer. If the product fails to perform in accordance with the product specifications, Respironics, Inc. will repair or replace – at its option – the defective material or part."

66.

Philips breached the express warranty in connection with the sale and distribution of the Subject Devices.

-33-

67.

The Subject Devices – while appearing to function properly – contained a Defect, rendering them unsuitable and unsafe for their ordinary and intended use.

68.

The Subject Devices are unable to perform in accordance with product specifications. In fact, Philips has now directed Plaintiff and the Class Members to cease using the Subject Devices due to the health risks from the Defect.

69.

Philips knows that the health of Plaintiff and the Class Members depend on daily use of a CPAP or BiPAP machine. Nevertheless, Philips has directed Plaintiff and the Class Members to cease using the Subject Devices without offering any timely repair, replacement, or refund.

70.

As a direct and proximate result of Philips's breach of express warranty, Plaintiff and the Class Members have sustained damages in an amount to be determined at trial.

## COUNT II

**BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY**
**(on behalf of the Nationwide Class or, Alternatively, on Behalf of the**
**Georgia Subclass)**

71.

Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

72.

As a manufacturer, distributor, and/or seller of the Subject Devices, Philips is a "merchant."

73.

The Subject Devices are "goods."

74.

By operation of law, implied in every sale of the Subject Devices is a warranty of merchantability that requires, inter alia, that the Subject Devices were of merchantable quality and safe for their ordinary and intended use.

75.

As alleged above, Philips issued an express warranty to Plaintiff and the Class Members, and the implied warranty of merchantability also extends to Plaintiff and the Class Members.

76.

Philips has breached the implied warranty of merchantability because – while appearing to function properly – the Subject Devices contained a Defect that made them unsuitable and unsafe for personal use. In fact, Philips has acknowledged as much and informed Plaintiff and the Class Members to not use the Subject Devices, despite Plaintiff's and the Class Members having health conditions that require daily use.

77.

Plaintiff and the Class reasonably expected, at the time of acquisition, that the Subject Devices were safe for their ordinary and intended use. Had Plaintiff and the Class Members known the Subject Devices were unsafe for use, they would not have purchased them.

78.

All of the Recall CPAP and BiPAP Machines were manufactured and distributed with the Defect and were, therefore, not of merchantable quality at the time they were placed into the stream of commerce by Philips.

79.

Despite the risks associated with the Subject Devices and Philips's recall notice directing Plaintiff and the Class Members to stop using the machines, Philips has refused to provide appropriate warranty relief. Philips refuses to

promptly repair or replace the Subject Devices or provide a refund to Plaintiff and the Class Members.

80.

As a direct and proximate result of Philips's breach of the implied warranty of merchantability, Plaintiff and the Class Members have sustained damages in an amount to be determined at trial.

## COUNT III

**VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
(15 U.S.C. §§ 2301 *et seq.*)
(on behalf of the Nationwide Class or, Alternatively, on Behalf of the
Georgia Subclass)**

81.

Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

82.

The Subject Devices are consumer products as defined in 15 U.S.C. § 2301(1).

83.

Plaintiff and the Class Members are consumers defined in 15 U.S.C. § 2301(3), and utilized the Subject Devices for personal use and not for resale or commercial purposes.

84.

Philips is a supplier and warrantor as defined in 15 U.S.C. § 2301(4) and (5).

85.

Philips provided Plaintiff and the Class Members with "written warranties" within the meaning of 15 U.S.C. § 2301(6).

86.

In its capacity as a warrantor, and by the conduct described herein, any attempt by Philips to limit the express warranties in a manner that would exclude coverage of the Defect alleged herein is unconscionable and any such effort to disclaim, or otherwise limit, liability for the defective Subject Devices is null and void.

87.

All jurisdictional prerequisites have been satisfied.

88.

Philips breached the express warranty by refusing to honor the express warranty to promptly repair or replace, free of charge, the defective machines and/or their components. Instead, Philips directed Plaintiff and the Class Members to stop using their Subject Devices, and to this day, have offered no repair, replacement, or refund despite interrupted daily use being medically

necessary for Plaintiff and the Class Members.

89.

At the time the Subject Devices were sold, Philips knew of the Defect they possessed and offered an express warranty with no intention of honoring said warranty with respect to the known defects.

90.

At no time has Philips offered a permanent or adequate repair or replacement of the Subject Devices. Despite demands that Philips either repair the defective Subject Devices, refund the amounts paid for the Subject Devices, or pay the costs associated with replacing the Subject Devices with a non-defective machine, Philips has not repaired the defective machines and refuse to replace them or provide a refund. Philips's refusal to provide an adequate repair or replacement violates 15 U.S.C. § 2304(d)(1).

91.

Philips was afforded a reasonable opportunity to cure its breach of the express warranty, but has failed to do so.

92.

As a direct and proximate result of Philips's breach of express and implied warranties, Plaintiff and the Class Members are entitled to revoke their acceptance of the Subject Devices, obtain damages and equitable relief in

an amount to be determined at trial, and obtain attorneys' fees pursuant to 15 U.S.C. § 2310.

## COUNT IV

### REVOCATION OF ACCEPTANCE
### (on behalf of the Nationwide Class or, Alternatively, on Behalf of the Georgia Subclass)

93.

Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

94.

Plaintiff and the Class Members assert this claim for revocation of acceptance of their Subject Devices.

95.

Plaintiff and the Class Members had no knowledge of such defects and nonconformities, were unaware of these Defect, and reasonably could not have discovered them when they purchased the Subject Devices. On the other hand, Philips was aware of the defects and nonconformities at the time of sale and thereafter.

96.

Acceptance was reasonably induced by the difficulty of discovery of the defects and nonconformities before acceptance.

97.

There has been no change in the condition of Plaintiff's Subject Devices not caused by the defects and nonconformities.

98.

Philips has refused to offer a refund in exchange for a return of the Subject Devices.

99.

Plaintiff and the Class Members would suffer economic hardship if they returned their CPAP and BiPAP Machines but did not receive the return of all payments made by them. Because Philips is refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiff and the Class Members have not re-accepted their defective Subject Devices by retaining them.

100.

These defects and nonconformities substantially impaired the value of the Subject Devices to Plaintiff and the Class Members. This impairment stems from two basic sources. First, the Subject Devices fail in their essential purpose because they are not able to be used by Plaintiff and the Class Members. Philips has directed Plaintiff and the Class Members to cease use of the machines because they present unreasonable health risks due to the

Defect, rendering them unsafe in a very material way. Second, the repair or replacement warranty has failed of its essential purpose because Philips has failed to provide a repair or replacement for the Subject Devices.

101.

Plaintiff and the Class Members provided notice of their intent to seek revocation of acceptance by a class action lawsuit seeking such relief. Plaintiff and the Class Members hereby demand revocations and tender their Subject Devices.

102.

Due to Philips's breach of warranties as set forth herein, Plaintiff and the Class Members assert as an additional and/or alternative remedy, as set forth in the Uniform Commercial Code (*see* O.C.G.A. § 11-2-608), for a revocation of acceptance of the goods, and for a return of the amounts paid for the Subject Devices and for such other incidental and consequential damages as allowed by law.

103.

Plaintiff and the Class Members are entitled to revoke their acceptances and receive a full refund and all incidental and consequential damages, including the costs associated with purchasing safe CPAP and BiPAP

Machines, and all other damages allowable under law, all in amounts to be proven at trial.

## COUNT V

**VIOLATION OF THE GEORGIA UNIFORM DECEPTIVE TRADE PRACTICES ACT**
**(O.C.G.A. §§ 10-1-370 *et seq.*)**
**(on behalf of the Georgia Subclass)**

104.

Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

105.

Plaintiff, the Class Members, and Philips are "persons" within the meaning of Georgia Uniform Deceptive Trade Practices Act ("UDTPA"), O.C.G.A. § 10-1-371(5).

106.

The UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard, quality, or grade" of goods or services," and "engag[ing] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." O.C.G.A. § 10-1-372(a).

107.

The UDTPA prohibits "deceptive trade practices, which include

"[r]epresent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresent[ing] that goods or services are of a particular standard, quality, or grade . . . if they are of another," "[a]dvertis[ing] goods or services with intent not to sell them as advertised," or "[e]ngag[ing] in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." O.C.G.A. § 10-1-372(a)(5), (7), (9) (12).

108.

By failing to disclose and actively concealing that the Subject Devices contain a known Defect that causes them to be unsafe and present serious and unreasonable health risks from use while misrepresenting them as safe, effective, reliable, state-of-the-art, etc., Philips engaged in deceptive practices prohibited by the UDTPA, including (i) representing that the Recalled CPA and BiPAP Machines had characteristics, uses, benefits, and qualities that they do not have; (ii) representing that they are of a particular standard, quality, or grade when they were of another; and (iii) advertising them with the intent not to sell or lease them as advertised.

109.

Philips also engaged in unfair and deceptive trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or

concealment, suppression or omission of any material fact with intent that others rely on such concealment in connection with the sale of the Subject Devices.

110.

Philips's unfair and deceptive acts or practices occurred repeatedly in Philips's course of trade and business, were material, were capable of deceiving a substantial portion of the purchasing public, and as a result, caused harm to owners and purchasers of the Subject Devices.

111.

Philips has known for some time, and before the sale of the Subject Devices to Plaintiff, that they suffered from the Defect, were unsafe for use due to the health risks posed by the degradation of the PE-PUR Foam, and were not suitable for their intended use.

112.

Philips had exclusive knowledge of material facts concerning the existence of the Defect in the Subject Devices. Furthermore, Philips actively concealed the Defect from consumers by denying its existence to Class Members who contacted Philips about the black particles in their machines and reports of illness by users.

113.

As alleged above, Philips made material statements about the nature, safety, and reliability of the Subject Devices that were either false or misleading.

114.

Philips was under a duty to Plaintiff and the Class Members to disclose the defective nature of the Subject Devices because: (i) Philips was in a superior position to know the true state of facts about the Defect and possessed exclusive knowledge of the nature of the Defect and the dangers and risks posed; (b) Philips actively and intentionally concealed the true facts from Plaintiff and the Class Members and/or made incomplete representations about the safety and reliability of the Subject Devices, while purposefully withholding material facts from Plaintiff that contradicted these representations; (c) Plaintiff and the Class Members could not reasonably have been expected to learn or discover that the Subject Devices had the Defect.

115.

Philips failed to disclose and actively concealed the Defect while continuing to deceive Plaintiff, Class Members, and the general public by marketing the Subject Devices as safe, effective, reliable, state-of-the-art, etc.

116.

Philips knew or should have known that its conduct violated the UDTPA.

117.

In failing to disclose the defective nature of the Subject Devices, and/or denying and misleading as to the true cause of complaints from Class Members and reports of black particles, Philips knowingly and intentionally concealed material facts and breached its duty not to do so.

118.

The facts Philips concealed from Plaintiff and the Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase one of the Subject Devices. Moreover, a reasonable consumer would consider the Defect to be an undesirable quality, as Plaintiff and the Class Members did. Had Plaintiff and the Class Members known that the Subject Devices had the Defect, they would not have purchased them and would not have used them, putting their health at serious risk.

119.

Plaintiff and the Class Members, like all objectively reasonable consumers, did not expect their Subject Devices to be defective and their use presenting serious and unreasonable health risks.

120.

As a result of Philips's misconduct, Plaintiff and the Class Members have been harmed and suffered injury-in-fact and actual damages in that they have purchased Subject Devices that they are unable to use because use presents serious and unreasonable health risks.

121.

As a direct and proximate result of Philips's unfair and deceptive practices, Plaintiff and the Class Members suffered and will continue to suffer injury-in-fact and/or actual damages in that their use of the Subject Devices has required that they now undergo medical monitoring for the health risks posed by the machines.

122.

Philips's violations present a continuing risk to Plaintiff, the Class Members, and the general public. Philips's unlawful acts and practices complained of herein affect the public interest.

123.

As a result of Philips's violations of the Georgia Uniform Deceptive Trade Practices Act, Plaintiff and the Class Members have been damaged and seek appropriate injunctive and equitable relief to remedy this misconduct and

ensure that it does not reoccur, along with all other remedies or damages

available under O.C.G.A. § 10-1-371 *et seq.*

## COUNT VI

## FRAUDULENT CONCEALMENT
**(on behalf of the Nationwide Class or, Alternatively, on Behalf of the Georgia Subclass)**

124.

Plaintiff incorporates by reference each allegation set forth in the

preceding paragraphs.

125.

Philips knew or should have known that the Subject Devices were and

are defective and unsafe for the reasons alleged above.

126.

Philips fraudulently concealed from and/or failed to disclose to , the Class

Members, and all others in the chain of distribution, the true nature of the

Subject Devices and, specifically, the Defect.

127.

Philips was under a duty to Plaintiff and the Class Members to disclose

these facts because: (i) Philips was in a superior position to know the facts

regarding the Defect in the Subject Devices and that the Defect is/was latent

and not easily discoverable by Plaintiff and the Class Members; (ii) Philips

made partial disclosures about the safety, efficacy, and quality of the Subject Devices while not revealing the defective nature of the PE-PUR Foam and the serious and unreasonable health risks it posed; (iii) the Defect poses a unreasonable and unreasonable safety hazard to Plaintiff and the Class Members; (iv) Philips fraudulently or recklessly concealed the defective nature of the Subject Devices from , the Class Members, and all others in the chain of distribution.

128.

The facts concealed and/or not disclosed by Philips to Plaintiff and the Class Members are material facts that a reasonable person would have considered important in deciding whether or not to purchase one of the Recalled CPAP or BiPAP Machines.

129.

Philips intentionally, willfully, maliciously, or recklessly concealed and/or failed to disclose the Defect with the Subject Devices for the purpose of inducing Plaintiff and the Class Members to purchase them.

130.

Philips knowingly, deliberately, and falsely marketed the Subject Devices as safe, effective, reliable, state-of-the-art, etc., despite being aware from complaints, notice, and investigation that black particles were entering

-50-

the airpath circuit of the Subject Devices when the PE-PUR Foam degrades, and that such particles may be ingested or inhaled by the user and that the PE-PUR Foam may off-gas certain harmful chemicals. Philips knew that such particle and chemical exposure created potential risks of serious illness including headaches, irritation, inflammation, respiratory issues, hypersensitivity, nausea/vomiting, and possible toxic and carcinogenic effects.

131.

Plaintiff and the Class Members did not know about the Defect or the associated safety risks and could not have known about the Defect or the associated safety risks when they purchased their Subject Devices because of Philips's concealment of the Defect.

132.

Plaintiff and the Class Members justifiably acted or relied upon – to their detriment – the concealed and/or non-disclosed facts as evidenced by their purchases of the Recalled CPAP or BiPAP Machines.

133.

Had Plaintiff and the Class Members known of the Defect, they would not have purchased their Subject Devices.

134.

As a direct and proximate result of Philips's misconduct, Plaintiff and

the Class Members have suffered actual damages in that they bought and own Subject Devices that are defective and cannot be used because of serious and unreasonable safety risks that they pose. Philips has provided no repair, replacement, or refund.

135.

Plaintiff and the Class Members have suffered losses resulting from Philips's fraudulent or reckless non-disclosure. Accordingly, Philips is liable for all damages proximately caused by its conduct in an amount to be proven at trial as well as attorneys' fees, costs, and any other just and proper relief available under the law.

136.

Additionally, Philips's acts and omissions were willful, wanton, malicious, oppressive, and show an intent to defraud as well as an entire want of care which raises the presumption of a conscious indifferences to the consequences. As such, Philips's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future in an amount to be determined at trial.

## COUNT VII

### FRAUDULENT MISREPRESENTATION
### (on behalf of the Nationwide Class or, Alternatively, on Behalf of the Georgia Subclass)

137.

Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

138.

Philips falsely represented to Plaintiff and the Class Members that the Subject Devices were safe for use, effective, and of high quality, when in fact the Subject Devices posed unreasonable health risks to users.

139.

Philips knew that its representations about the Subject Devices were false because Philips knew that the Subject Devices posed serious health risks because the PE-PUR Foam may degrade and allow toxic black particles to be inhaled or ingested by users and the PE-PUR Foam had the potential to off-gas harmful chemicals.

140.

Philips promoted the Subject Devices as safe, effective, and of high quality, despite failing to adequately research and test the devices prior to

marketing and promotion their use.

141.

Philips promoted the Subject Devices as safe, effective, and of high quality, despite failing to adequately investigate complaints and reports concerning black particles within the airpath of the Subject Devices and complaints and reports of illness from users.

142.

Philips intentionally, knowingly, and recklessly made these misrepresentations and omissions to induce Plaintiff and the Class Members to purchase the Subject Devices.

143.

Philips knew that its representations about the Subject Devices were false and that the PE-PUR Foam put users of the Subject Devices at risk of serious adverse health effects in a manner that does not conform to the products' labels, packaging, advertising, and statements. Philips knowingly allowed its packaging, labels, advertisements, promotional materials, and websites to intentionally mislead Plaintiff and the Class Members about the Subject Devices.

144.

Philips falsely represented the nature and risks associated with the

Subject Devices in its marketing and its statements to the media, general public, and government agencies.

145.

Philips's fraudulent misrepresentations were material facts that were essential to Plaintiff's and the Class Members' decisions to purchase their Subject Devices.

146.

Plaintiff and the Class Members justifiably relied to their detriment on Philips's fraudulent misrepresentations. If Plaintiff and the Class Members had been told the truth about the safety of the Subject Devices, and not intentionally deceived by Philips, Plaintiff and the Class Members would not have purchased their Subject Devices.

147.

As a direct and proximate result of Philips's fraudulent misrepresentations, Plaintiff and the Class Members have suffered actual damages in that they purchased Subject Devices that are worthless (or at least worth less than the prices paid for them) and Plaintiff and the Class Members would not have purchased the Subject Devices at all had they known of the serious health risks associated with their use, instead of being deceived by

Philips's representations concerning the safety, efficacy, and quality of the Subject Devices as alleged above.

148.

Plaintiff and the Class Members have suffered losses resulting from Philips's fraudulent misrepresentations. Accordingly, Philips is liable for all damages proximately caused by its conduct in an amount to be proven at trial as well as attorneys' fees, costs, and any other just and proper relief available under the law.

149.

Additionally, Philips's acts and omissions were willful, wanton, malicious, oppressive, and show an intent to defraud as well as an entire want of care which raises the presumption of a conscious indifferences to the consequences. As such, Philips's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future in an amount to be determined at trial.

## COUNT VIII

**NEGLIGENT MISREPRESENTATION**
**(on behalf of the Nationwide Class or, Alternatively, on Behalf of the Georgia Subclass)**

150.

Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

151.

Philips owed a duty to exercise reasonable and ordinary care in the providing information about the Subject Devices to all who were relying on the information provided including Plaintiff and the Class Members, as well as their physicians and healthcare providers, including information that the devices had been tested and found to be safe and effective for treating sleep apnea.

152.

In the course of selling the Subject Devices, Philips supplied information about the Subject Devices through advertising, marketing campaigns, sales representatives, packaging, labeling, promotional materials, websites, and notices and reporting to health care providers and government agencies. Philips breached its duty to Plaintiff and the Class Members by providing information through these channels that the Subject Devices were safe,

effective, and of high quality when Philips was either aware of should have been aware that the Subject Devices were not safe for use but rather presented serious and unreasonable health risks to users.

153.

Philips's misrepresentations concerning the Subject Devices' safety were material facts that were essential to Plaintiff's and the Class Members' decisions to purchase their Subject Devices.

154.

Plaintiff and the Class Members justifiably relied to their detriment on Philips's misrepresentations. If Plaintiff and the Class Members had been told the truth about the safety of the Subject Devices, Plaintiff and the Class Members would not have purchased their Subject Devices.

155.

As a direct and proximate result of Philips's misrepresentations, Plaintiff and the Class Members have suffered actual damages in that they purchased Subject Devices that are worthless (or at least worth less than the prices paid for them) and Plaintiff and the Class Members would not have purchased the Subject Devices at all had they known of the serious health risks associated with their use, instead of being deceived by Philips's

representations concerning the safety, efficacy, and quality of the Subject Devices as alleged above.

156.

Plaintiff and the Class Members have suffered losses resulting from Philips's misrepresentations. Accordingly, Philips is liable for all damages proximately caused by its conduct in an amount to be proven at trial as well as attorneys' fees, costs, and any other just and proper relief available under the law.

## COUNT IX

**UNJUST ENRICHMENT**
**(In the Alternative)**
**(on behalf of the Nationwide Class or, Alternatively, on Behalf of the Georgia Subclass)**

157.

Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

158.

By its wrongful acts, Philips was unjustly enriched at the expense of Plaintiff and the Class Members.

159.

Philips knowingly, fraudulently, systematically, and uniformly marketed, promoted, and sold its defective and dangerous Subject Devices using false and misleading statements and while omitted and concealing material facts about these products.

160.

In purchasing the Subject Devices, Plaintiff and the Class Members relied on Philips's fraudulent, false, and misleading statements, in addition to Philips's omissions and concealment of material fact.

161.

In purchasing the Subject Devices, Plaintiff and the Class Members conferred a tangible and material economic benefit upon Philips.

162.

Plaintiff and the Class Members would not have purchased, chosen, and/or paid for all or part of the Subject Devices had they known the true facts about the Subject Devices and the serious health risks posed by their use.

163.

Plaintiff and the Class Members can no longer use the Subject Devices and are at risk of developing serious medical conditions due to their prior use.

164.

Philips is not providing a timely repair, replacement, or refund for the Subject Devices.

165.

Under these circumstances, it would be unjust and inequitable for Philips to retain the economic benefits they obtained from its fraudulent, deceptive, and misleading conduct.

166.

Plaintiff and the Class Members seek restitution from Philips, and seek an order from this Court disgorging all profits, benefits, and other compensation obtained by Philips from its wrongful conduct.

167.

Plaintiff and the Class Members suffered damages in an amount to be determined at trial.

## **COUNT X**

### **MEDICAL MONITORING**
**(on behalf of the Nationwide Class or, Alternatively, on Behalf of the Georgia Subclass)**

168.

Plaintiff incorporates by reference each allegation set forth in the preceding paragraphs.

169.

Due to Philips's actions and inactions, and the serious health risks caused by the Subject Devices as alleged in this Complaint, including those acknowledged by Philips, medical monitoring is, to a reasonable degree of medical certainty, necessary to properly and timely diagnose the warning signs of the toxic effects of use of the Subject Devices.

170.

Plaintiff and the Class Members are thus entitled to have Philips pay for the costs of ongoing medical monitoring.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff requests, individually and on behalf of the Class, that this Court:

a) Process issue and Defendants be served as provided by law;

b) Determine that the claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2), (b)(3) and/or (c)(4) of the Federal Rules of Civil Procedure on behalf of the Nationwide Class and Georgia Class defined above; and designate Plaintiff as the class representative, and Plaintiff's counsel as Class Counsel;

c) Plaintiff has a trial by jury;

d)  Plaintiff be awarded actual, general, special, incidental, punitive, and consequential damages to which Plaintiff and the Class Members are entitled;

e)  Plaintiff be awarded attorneys' fees and cost of litigation in an amount which will be proven through the evidence at the time of trial;

f)  Plaintiff be awarded interest and costs; and

g)  Plaintiff be awarded such other relief as this Court deems just and proper.

TRIAL BY JURY IS HEREBY DEMANDED ON ALL ISSUES SO TRIABLE.

Dated:  September 29, 2021.

Respectfully submitted,

**SHIVER HAMILTON, LLC**

*/s/ Kyle G.A. Wallace*
Jeff P. Shiver
Georgia Bar No. 001303
Kyle G.A. Wallace
Georgia Bar No. 734167

***Attorneys for Plaintiffs***

3490 Piedmont Road, Suite 640
Atlanta, Georgia 30305
Telephone: (404) 593-0020
Facsimile: (888) 501-9536
jeff@shiverhamilton.com
kwallace@shiverhamilton.com

**HUDSON INJURY FIRM**

/s/ J. Shane Hudson
J. Shane Hudson
Georgia Bar No. 153047
**Attorney for Plaintiffs**

**HUDSON INJURY FIRM**
615 N. Virginia Avenue, Ste. A
P.O. Box 2520
Tifton, Georgia 31793
(229) 396-5845
jshudson@hudsoninjuryfirm.com